IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TRUSTEES OF CHICAGO PLASTERING )
INSTITUTE PENSION TRUST, et al., )
)
              Plaintiffs, )
)
  v. ) No. 08 C 1575
)
ELITE PLASTERING CO., INC., )
)
              Defendant. )

## MEMORANDUM OPINION AND ORDER

This action has been brought by a group of funds and other organizations that represent workers in the plastering industry (collectively "Funds" for convenience, although certain of the organizations (including a union) are not actually employee benefit funds) against Elite Plastering Co., Inc. ("Elite") under Labor Management Relations Act ("LMRA") §301 (29 U.S.C. §185) and Section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA") §502(a)(3)(29 U.S.C. §1132(a)(3)) to collect, under a theory of successor liability, allegedly delinquent employee benefit fund contributions, union dues and other amounts. Each side has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Elite's motion is granted, Funds' is denied and this action is dismissed.

## Summary Judgment Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

One more complexity is potentially added here, where cross-motions for summary judgment are involved. Those same principles require the adoption of a dual perspective that this Court has sometimes referred to as Janus-like: As to each motion the nonmovant's version of any disputed fact must be credited. In this instance, though, any potential difficulty created by that requirement has been obviated by the litigants' entry into a Joint Statement of Stipulated Facts.[1]

---

[1] What follows next is a summary of the facts under the criteria prescribed by Rule 56 and this District Court's LR 56.1, which supplements Rule 56 by requiring each party to submit evidentiary statements and responses to such statements to highlight what asserted facts are disputed and which facts are agreed upon. This opinion cites to the Joint Statement of Stipulated Facts as "Stip. ¶ --." In referring to other

2

Background

Funds' Action Against G&J

Cork Plastering Co., Inc. ("Cork") is an Illinois corporation that was known as G and J Plastering Co., Inc. ("G&J") until April 3, 2006 (Stip. ¶4). G&J operated as a construction-plastering contractor (id.). From 1993 onward G&J was bound by the terms of a series of collective bargaining agreements ("CBAs") negotiated by plaintiff Journeyman Plasterers Protective and Benevolent Society of Chicago, Local No. 5 ("Local 5") and a contractors' association (Stip. ¶¶6, 7, 11). Under the CBAs G&J was to remit dues to Local 5 and contributions to the Funds (Stip. ¶¶9-10). Those obligations lasted until November 14, 2002, when the NLRB certified the International Union of Bricklayers and Allied Craftworkers, Locals 56 and 74, AFL-CIO ("Local 56") as the exclusive collective bargaining representative for G&J's employees (Stip. ¶¶12, 14).

Funds sued G&J in 2003 in this District Court, charging that G&J had not cooperated with a request to audit its records to determine compliance with its contribution obligations (Stip. ¶15). After a bench trial in 2007, G&J was found delinquent in the payment of dues and contributions for thousands of hours of covered work, and judgment was entered in favor of Funds for

---

submissions by the parties (such as their respective legal memoranda ("Mem.")), this opinion uses the designation "F." for Funds and "E." for Elite.

$1,109,466.23 plus costs and attorneys' fees (Stip. ¶¶17-20). Cork (as G&J is now known) has no assets with which to satisfy the judgment, and G&J had insufficient assets as of April 3, 2006 to have paid the judgment in full (Stip. ¶21).

G&J's Asset Sale to Elite

Beginning in late 2005 G&J's majority shareholder George Palicsek ("Palicsek") complained several times to longtime acquaintance Nandor Vodnak ("Vodnak") about the financial state of G&J and told Vodnak that he intended to auction off the company's equipment and close the business (Stip. ¶¶25-28). During one of their phone conversations, Vodnak asked Palicsek what he thought the assets would be worth at auction (Stip. ¶29). Palicsek described the inventory and said he thought it would fetch $150,000 (Stip. ¶¶29-30). After the two had discussed the company's equipment in some detail, Vodnak offered to purchase the assets for $120,000 and Palicsek accepted (Stip. ¶31). That was the entire extent of their negotiations (Stip. ¶42). Vodnak, who had no experience running a construction business or working as a plasterer, traveled from his California home to Illinois in early April 2006 to close the deal (Stip. ¶¶33-34, 40).

Palicsek retained attorney Alan Garrow ("Garrow") to prepare an asset purchase agreement ("Agreement") and to represent him at closing (Stip. ¶44). Garrow was also representing G&J in its ongoing litigation with Funds, so of course he knew of Funds'

claims against G&J for delinquent contributions (Stip. ¶¶44, 47). Vodnak (who was not separately represented), Palicsek and Garrow met for closing at Garrow's office on April 3, 2006 (Stip. ¶¶45, 50).

During the meeting Vodnak asked Garrow to prepare articles of incorporation for Elite, the new company that would purchase the assets (Stip. ¶46). All parties consented to the dual representation arrangement via a consent form, which sharply limited the scope of Garrow's representation of Elite (id.).[2] Garrow then served as Elite's registered agent for a few months and maintained Elite's corporate minute book for some unspecified period (Stip. ¶¶46, 48). Neither Garrow nor Palicsek told Vodnak about Funds' lawsuit against G&J (Stip. ¶51). Under the purchase Agreement Elite acquired substantially all of G&J's assets, including the right to do business under G&J's name, and assumed the responsibility to complete G&J's ongoing jobs (Stip. ¶54).

After the closing Vodnak and Palicsek went to G&J's facility so that Vodnak could see what Elite had just bought (Stip. ¶55).[3]

---

[2] Under the consent form Garrow was retained "for the limited purpose of forming the corporate entity," he "provided no counsel, advice, or representation associated with the sale and purchase of any assets from G and J Plastering Co., Inc." and he was to serve as registered agent for Elite "for a temporary period until a replacement can be determined" (Stip. Ex. F).

[3] In explaining why he had purchased the assets without conducting an investigation, Vodnak said, "I was just buying assets. I am not buying the company...it's like buying a used car" (Stip. ¶61). Vodnak did not consult anyone about what sort

5

During that visit Vodnak met with several G&J employees for the first time (Stip. ¶68). At least two of the employees, G&J President Lorand Stranyiczki ("Stranyiczki") and Doug Wasilevich ("Wasilevich"), knew of Funds' lawsuit against G&J and eventually testified at trial (Stip. ¶¶76, 82). Vodnak hired both Stranyiczki and Wasilevich to serve in management positions at Elite and asked them to perform largely the same jobs they had performed at G&J (Stip. ¶¶73-75, 79, 81). Vodnak also extended offers to the remainder of G&J's office staff and other employees (Stip. ¶86).

After the transition Elite took over several already-in-progress G&J jobs (Stip. ¶85), bid for new jobs under the name G&J (id.), continued to operate out of the same facility that G&J had occupied (Stip. ¶89), kept G&J's telephone number (id.), continued to perform the same kinds of work using the same tools (Stip. ¶91) and offered the same services as G&J (Stip. ¶92). In an April 2006 letter to customers Stranyiczki called the sale a "restructuring" and stated "there will be no change in the way our company does business" (Stip. Ex. G). Vodnak did institute a few changes, such as the utilization of smaller crews of plasterers (Stip. ¶93), the inclusion of change orders in bid

---

of due diligence he should perform (Stip. ¶57), learn anything about G&J's employees (Stip. ¶58), inspect any of the equipment (Stip. ¶62), examine the company's books (Stip. ¶65) or search court records for pending litigation (Stip. ¶66).

prices (id.) and the increased usage of pumps in applying plaster (Stip. ¶91).

Vodnak went back to California soon after the closing (Stip. ¶94). From there he maintains remote contact with Elite via telephone and e-mail every couple of days, and he returns to the Chicago area a few days every two months or so to check on the business (Stip. ¶95).[4] In November 2006, seven months after the asset sale, Vodnak first learned of Funds' lawsuit during a conversation with Palicsek (Stip. ¶96).[5] Funds instituted these proceedings in March 2008, alleging that Elite was responsible for satisfying the judgment against G&J under the theory of successor liability (Complaint ¶¶20-21).

## Successor Liability

Companies purchasing the assets of other companies generally do not assume their liabilities (EEOC v. G-K-G, Inc., 39 F.3d 740, 747 (7th Cir. 1994)). But when liabilities stem from violations of federal rights under statutes such as LMRA and ERISA, courts relax the doctrine somewhat (John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 550-51 (1964); Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920

---

[4] Vodnak actually owns 50% of the company, while his wife Vera Turi ("Turi"), also of California, owns the other 50% (Stip. ¶¶23-24).

[5] Turi also disclaims prior knowledge of Funds' suit against G&J (Turi Aff. ¶6). That has not been disputed by Funds.

7

F.2d 1323, 1327-29 (7th Cir. 1990)). Three factors then control the analysis: (1) whether the successor firm had prior notice of the claim against the predecessor, (2) whether the predecessor is able, or was able at the time of the sale, to pay the judgment and (3) whether there has been a "sufficient continuity in the business operations" between the two companies (<u>Wheeler v. Snyder Buick, Inc.</u>, 794 F.2d 1228, 1236 (7th Cir. 1986)). Each of the first two factors is "critical" because (<u>Musikiwamba v. EESI, Inc.</u>, 760 F.2d 740, 750 (7th Cir. 1985)):

> [I]t would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price.

Inability of the predecessor to pay is not at issue here, given the stipulation that G&J has no assets and did not have assets sufficient to satisfy the judgment at the time of the asset sale (Stip. ¶21). And there may well be "sufficient continuity" between the two businesses to satisfy the third factor. But it proves unnecessary to reach that question, for Elite did not have the all-important notice of Funds' claims against G&J before the asset purchase. Hence successor liability does not attach.

Funds advances three theories to support its argument that Elite had notice of Funds' claims against G&J. First, Funds

8

argues that knowledge can be imputed through Garrow, who represented G&J in the Funds suit and helped incorporate Elite before serving for a time as its registered agent (F. Mem. 11-12). Second, Funds contends that knowledge can be imputed through Stranyiczki, who worked for G&J, knew of the suit and continued his managerial duties for Elite (F. Mem. 12-13). Third, Funds asserts that knowledge can be imputed through Elite's lack of due diligence in uncovering the potential liability (F. Mem. 13-15).

Funds' attempted reliance on Stranyiczki's role merits minimal discussion. Successor liability can attach only when a successor firm has knowledge of the liability <u>before</u> acquiring the assets (<u>Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.</u>, 59 F.3d 48, 49 (7th Cir. 1995)), so that it has the already-referred-to "opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price" (<u>Musikiwamba</u>, 760 F.2d at 750). Here Stranyiczki did not join Elite--indeed, Vodnak did not even know of his existence--until <u>after</u> the closing (Stip. ¶¶56, 58, 64, 71).

Funds' other two contentions raise more complicated questions. This opinion turns, then, to those arguments.

<u>Imputation Through Garrow</u>

It is of course a legal fiction to speak of a corporation

literally "knowing" anything. Instead "a corporation 'knows' through its agents" (United States v. One Parcel of Land, 965 F.2d 311, 316 (7th Cir. 1992)). Where an agent gains knowledge "while acting within the scope of her authority"[6] that relates to "a matter within the scope of that authority," the knowledge is generally imputed to the corporate principal (Juarez v. Ameritech Mobile Commc'ns, Inc., 957 F.2d 317, 321 (7th Cir. 1992)).

Garrow unquestionably knew of Funds' lawsuit when he helped to incorporate Elite--after all, he was representing G&J in that suit (Stip. ¶¶44, 47). Funds urge that such knowledge should be imputed to Elite because Garrow had a duty to disclose it once he assumed representation of Elite, even for a limited purpose (F. Mem. 11-12). Elite responds that such imputation is inappropriate because Garrow had gained his knowledge of the suit before and outside the scope of his relationship with Elite (E. Mem. 7).

If the temporal aspect of the agency test were as straightforward as Elite (and cases such as Juarez) suggest, this would be an easy question to decide because Garrow did gain his knowledge of Funds' claim years before he represented Elite. But the law is not actually that simple. As already indicated, some

---

[6] Although the quoted case (and some others) employ female pronouns because of the identity of the agent involved, this opinion will of course use the masculine pronouns in the context of this case.

10

cases (such as Juarez)--though without actually addressing the issue--mention in passing the need for an agent to have gained knowledge "while acting within the scope of her authority." But the more accurate rule appears to be that imputation is appropriate where an agent clearly knows material information that he has a duty to disclose, even if he learned that information before he started working on behalf of the principal (see, e.g., Shenandoah Valley Poultry Co. v. Armour & Co., 854 F.2d 1013, 1018 (7th Cir. 1988)).[7]

Indeed, general agency principles establish that "[a]n agent brings the totality of relevant information that the agent then knows to the relationship with a particular principal" and that his mind "cannot be divided into compartments" (Restatement (Third) of Agency §5.03 cmt. e (2006)). While an agent may not be under any duty to disclose facts learned before an agency relationship if those facts have since been forgotten (id. at cmt. b), here there is no question that Garrow knew of the potential liability--and it cannot be (and has not been) suggested that he failed to remember it. In sum, the fact that he obviously learned of the lawsuit before representing Elite does not by itself make imputation inappropriate.

Elite's second argument--that knowledge of the lawsuit and

---

[7] Although Shenandoah was a diversity case applying Indiana law, at least one of the cases cited there included the generic temporal reference (854 F.2d at 1018 n.3).

11

the potential liability was outside the scope of Garrow's agency relationship with Elite--carries a great deal more force. Garrow was retained by Vodnak only "for the limited purpose of forming the corporate entity" (Stip. Ex. F). As to Vodnak (and hence Elite) he "provided no counsel, advice, or representation associated with the sale" (id.). Garrow represented G&J and not Elite "in said transaction" (id.), and "[a] client is not charged with a lawyer's knowledge concerning a transaction in which the lawyer does not represent the client" (Restatement (Third) of the Law Governing Lawyers §28 cmt. b (2000)).

This case is patently distinguishable from Frey v. Fraser Yachts, 29 F.3d 1153 (7th Cir. 1994), on which Funds seeks to rely. There the knowledge of a broker's conflict of interest was held to be imputable to plaintiff Frey through a letter sent to his lawyer (id. at 1158). Frey argued that imputation was inappropriate in light of the limited scope of his lawyer's authority (id.) But the court stressed that Frey's lawyer had express authority to "take all other actions and sign all other documents necessary or appropriate" to complete the deal (id., emphasis omitted). Consequently the lawyer's scope of authority encompassed the knowledge gained through the letter at issue.

By contrast, here Garrow had no authority before the sale to do anything for Elite other than to fill out the incorporation paperwork (Stip. ¶46, Ex. F). Such performance of mere

12

"ministerial acts" did not impose on his a duty to warn Elite about all potential pitfalls of the sale (see, e.g., Keach v. U.S. Trust Co., 254 F.Supp.2d 1048, 1052 (C.D. Ill. 2003)).

Indeed, even a moment's thought reveals the untenable nature of Funds' position. True dual representation (of which this was not at all an instance) is always fraught with perils. If Garrow had in fact been acting as counsel for both parties in the sale transaction, the resulting obligation to make full disclosure to Vodnak and Elite of his knowledge of the G&J litigation would have revealed a potential deal-killer, violating his equal duty of loyalty to Palicsek and G&J. And that revelation would have carried with it a duty for him to engage in an analysis of the successor liability issue and to advise as to the type of protective measures identified in Musikiwamba.[8]

In the circumstances of this case, it would be intolerable to force Garrow to carry water on both those figurative shoulders of professional responsibility. Little wonder that he sensibly had the parties sign the carefully structured consent form that eliminated such a conflict of interest. At bottom, then, the very limited scope of Garrow's authority negates any imputation to Elite of his own knowledge of G&J's potential liability to Funds.

---

[8] Advise whom? In that hypothetical scenario Garrow would be faced with an insoluble conflict of interest.

13

Imputation Through Elite's Failure To Perform Due Diligence

Finally Funds argues that even if Elite cannot otherwise be charged with knowledge of the potential liability, its failure to perform any due diligence to uncover the lawsuit should lead this Court to impute the requisite notice to Elite (F. Mem. 13). Elite responds that no such duty of inquiry existed here because it was not already on notice of specific facts about G&J that would give rise to such a duty (E. Mem. 10). Elite has by far the better of that exchange.

In the successor liability context our Court of Appeals has declined to mandate due diligence by all purchasers (Wheeler, 794 F.2d at 1237). To be sure, where agents of a successor company already know of claims against the predecessor, they have a duty to inquire about the status of those claims and other claims arising from the same dispute (EEOC v. Vucitech, 842 F.2d 936, 945 (7th Cir. 1988)). But where the successor lacks such knowledge, courts should "refrain from subjecting the doctrine of successor liability to judicial surgery" through a due diligence requirement (Wheeler, 794 F.2d at 1237).

Here it is undisputed that Elite had no prior knowledge of the sort of specific information that would mandate further inquiry.[9] Vodnak knew only that Palicsek was having "problems

---

[9] In the interest of simplicity (and indeed accuracy), the remainder of this section will refer only to Vodnak's knowledge (or, more accurately, the lack of it). Because Turi has

14

because of the [G&J] business" and was "losing money" (Stip. ¶27). Among the many aspects of the business about which he was ignorant, he did not know how many employees worked for G&J or with which unions the company bargained (Stip. ¶56). Moreover, even if Vodnak had learned of G&J's labor arrangement, that would have pointed him only to the CBA with Local 56, which was in effect at the time of the asset sale (Stip. ¶13). By then it had been more than three years since G&J had ended its contractual relationship with Local 5 (Stip. ¶14).

That situation is a far cry from <u>Vucitech</u>, to which Funds points in an effort to buttress its argument that due diligence was required. In <u>Vucitech</u> the officers of a corporation retired knowing that employees had already registered complaints with EEOC, charging that a company policy violated the Pregnancy Discrimination Act of 1978 (842 F.2d at 939). Less than two years later the officers came out of retirement, bought the assets of the company and started a new business that performed largely the same functions (<u>id</u>.). Within six months after the asset purchase, EEOC filed suit against the alleged successor and the officers (<u>id</u>.).

Through their previous ownership of the predecessor the

---

disclaimed such knowledge (Turi Aff. ¶6) and Funds makes no argument otherwise (F. Resp. Mem. 3 n.2), the same analysis would apply to her as well.

owners already knew about the EEOC complaints.[10]  In holding successor liability appropriate, the court reasoned that because the officers could easily have inquired of EEOC about the status of the known complaints, the potential liability should have been no surprise to them (id. at 945).

Again by way of total contrast, no continuity of ownership between the two companies exists in this case (Stip. ¶59), and the liability at issue arose from dealings with a union with which the predecessor had no contractual relationship for more than three years before the asset sale (Stip. ¶14).  Vodnak would have had to perform much more than a narrow inquiry into the status of a specific source of liability to discover Funds' suit against G&J.

Funds' contention that Musikiwamba compels the imposition of such a broad-based due diligence requirement also fails.  They attempt to invoke this generalized dictum (760 F.2d at 752):

> Normally, the burden would be on the successor to find out from the predecessor all outstanding potential and actual liabilities.

But in the very next year Wheeler, 794 F.2d at 1237 explicitly rejected the imposition of an across-the-board due diligence inquiry.

Rather than fashioning a new test to determine how much

---

[10] Indeed, they had been the ones who crafted the policy that led to the complaints (Vucitech, 842 F.2d at 945).

16

diligence is due in this type of case, this Court heeds <u>Wheeler</u>'s admonition that "the national dimensions" of the question "are likely to be explored more adequately and responded to more effectively by Congress than by the courts" (<u>id</u>.). And so because Elite was not on notice of the sort of specific facts that triggered a duty to inquire in <u>Vucitech</u>, its lack of investigation of G&J before the asset purchase does not trigger an imputation of knowledge of G&J's liability.[11]

<u>Conclusion</u>

As stated in the <u>Summary Judgment Standards</u> section, there is no genuine issue of material fact. Analysis of the agreed facts has demonstrated that no successor liability attaches to Elite for G&J's liabilities. Consequently Elite is entitled to a judgment as a matter of law. Its Rule 56 motion is granted, Funds' like motion is denied and this action is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date:  March 20, 2009

---

[11] It must be said, though, that Vodnak's likening of his $120,000 purchase to "buying a used car" (n.3) is more than a bit disingenuous. This was not exclusively an asset purchase, for it also encompassed the assumption of some liabilities: the obligation to complete G&J's ongoing jobs. There can surely be a legitimate inquiry into whether the asset acquisition also betokened the assumption of other liabilities--the inquiry just completed in this opinion. But in light of all of the other factors this opinion has discussed, Vodnak (and hence Elite) cannot be held to the equivalent of this Circuit's "ostrich" instruction as to imputed knowledge in criminal cases (7th Cir. Fed. Jury Instr. (Crim.) 4.06 (1998)).

17